PAUL LEWIS BROWNING, Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 18157

June 24, 1988                                                  757 P.2d 351

[Rehearing denied August 16, 1988]

*Beury & Schubel,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Rex Bell,* District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

At approximately 4:20 p.m. on November 8, 1985, Hugo Elsen was senselessly stabbed to death while working in his jewelry store. Josy Elsen, Hugo's wife, was resting in the back room of the jewelry store at the time of the killing. When she heard a scuffling sound, Josy entered the showroom where she saw a black man wearing a blue cap squatting over Hugo and

holding a knife. Josy immediately fled out the back of the store. Appellant Paul Lewis Browning was apprehended shortly thereafter. Based on overwhelming evidence, Browning was convicted of Hugo's killing.

On December 31, 1985, Browning was arraigned in district court and trial was set for March 3, 1986. On February 28, 1986, the state informed the district court that the deputy district attorney who had appeared at the December 31, 1985, arraignment had erroneously written down the trial date as March 31, 1986. As a result, the state was not prepared to go forward with the trial as scheduled on March 3, 1986. Upon the state's request, the district court granted a continuance, setting the trial for March 31, 1986.

On appeal, Browning contends that by delaying his trial twenty-eight days, the district court violated his constitutional right to a speedy trial. We disagree.

Although Browning promptly invoked his right to a speedy trial, under the circumstances of this case, the mere twenty-eight day delay is insufficient to justify dismissal of the charges against him. Due to the severity of the crimes charged, we will tolerate a longer delay than we might for a crime of less egregious proportions. *See* Barker v. Wingo, 407 U.S. 514 (1972). In addition, the reasons underlying the delay do not justify Browning's release; namely, the deputy district attorney's honest, but negligent, mistake in transcribing the appropriate trial date and the professed inability to locate key prosecution witnesses prior to trial do not reveal an improper motive by the state in requesting the delay. Thus, this is not a case involving a deliberate attempt to delay trial in order to hamper the defense, and therefore we need not be so concerned with policing the state's activity. *See Barker,* 407 at 531. Moreover, Browning has not reasonably identified how the twenty-eight day delay has prejudiced his defense. In light of the overwhelming evidence of guilt presented against him at trial, it is clear that any alleged prejudice would not rise to the level justifying dismissal of the charged crimes.

Browning also contends that by delaying his trial twenty-eight days the district court violated Browning's statutory right to a speedy trial. Once again we disagree. Dismissal of the information is within the discretion of the district court where the defendant is not brought to trial within sixty days. NRS 178.556(1). For the reasons set forth in connection with the constitutional speedy trial claim, we hold that the district court did not abuse its discretion by failing to dismiss the charges against Browning.

During jury selection, two black men were drawn as part of the jury panel. The state, however, used peremptory challenges to remove both black men from the jury. Browning, a black man, argues that the elimination of both black prospective jurors deprived him of his right to an impartial jury drawn from a representative cross section of the community in violation of his fourteenth amendment right to equal protection of the law.

Browning appropriately suggests that the elimination of both black jury panel members established a prima facie case of purposeful discrimination. Batson v. Kentucky, 476 U.S. 79 (1986). Thus, it is encumbent upon the state to provide a racially-neutral explanation for dismissing both black panel members by peremptory challenge. Batson, 476 U.S. at 97. The state promptly explained that each of the dismissed panel members had expressed an unalterable opposition to the death penalty. Upon review of the record, it is unmistakably clear that each of the dismissed black panel members did indeed express the position that they would automatically vote against the imposition of capital punishment without regard to the evidence presented at trial. We hold that this reason is sufficiently "racially-neutral" to warrant removal by peremptory challenge in a capital case such as the instant action. See Bean v. State, 86 Nev. 80, 465 P.2d 133 (1970). Consequently, there was no showing of purposeful racial discrimination, and Browning's right to equal protection was not transgressed.

Browning also submits that he was denied a fair trial by numerous acts of prosecutorial misconduct. Of those few alleged acts of misconduct properly preserved for review, we believe only one alleged incident of misconduct merits discussion.

During closing argument the state recounted the stabbing episode according to its view of the evidence. The prosecutor became overly-animated, saying, "And there was probably wild stabbing going on, a hacking, a Friday-the-13th kind of scenario." Reference to the horror flick "Friday-the-13th" served no purpose other than to divert the jury's attention from its sworn task. However, in light of the overwhelming evidence presented at the guilt phase of the trial, we cannot find the quantum of prejudice required to reverse.[1]

---

[1]We also denounce the state's reference to the "presumption of innocence" as a farce. The fundamental and elemental concept of presuming the defendant innocent until proven guilty is solidly founded in our system of justice and is never a farce. Even this outrageous but unpreserved act of misconduct, however, does not prejudice Browning to the extent justifying reversal.

Browning also argues that he was given insufficient notice of the state's intent to seek the death penalty. According to NRS 175.552, the state is permitted to introduce evidence of additional aggravating circumstances *other than* the aggravated nature of the offense itself only if the defendant has been notified of the intended introduction before the penalty hearing commences. NRS 175.552. The presentation of evidence regarding the aggravated nature of the crime is not restricted by NRS 175.552.

[Headnote 5]

The only penalty hearing evidence attacked by Browning on appeal which involves aggravating circumstances, other than the aggravated nature of the offense itself, is testimony concerning prior crimes of violence committed by Browning. At the penalty hearing, however, Browning did not argue NRS 175.552 as grounds for excluding the testimony; rather, Browning contended that such testimony was inadmissible hearsay. The trial court properly rejected Browning's hearsay challenge pursuant to the directive of NRS 175.552 which permits the introduction of aggravating circumstances evidence "whether or not the evidence is ordinarily admissible." NRS 175.552. Since new grounds for an objection may not be raised on appeal, Geer v. State, 92 Nev. 221, 548 P.2d 946 (1976), we reject Browning's attack.[2]

After the police apprehended Browning, he was escorted back to the crime scene where he was shown to three individuals. Two of these individuals had seen a black man in a blue cap jogging away from the scene of the crime at approximately the time of the crimes. Browning argues that the pretrial identification testimony of the two witnesses was improperly admitted at trial because it was derived from an unnecessarily suggestive procedure resulting in irreparable mistaken identifications, thereby denying him due process. *See* Neil v. Biggers, 409 U.S. 188 (1972).

Although the one-man show-up procedure applied by the police officers may have been suggestive under the circumstances of this case, the related testimony is not inadmissible unless the identifications were unreliable. *See* Gehrke v. State, 96 Nev. 581, 613 P.2d 1028 (1980). We hold that the identifications were reliable, and hence the related testimony was properly admitted into evidence.[3] *See Gehrke,* 96 Nev. at 584, 613 P.2d at 1030

---

[2]We note that Browning had actual notice of the state's intent to produce the contested testimony of at least six days, and possibly seven days. Under the circumstances of this case, this six-day notice period is adequate to meet the mandate of NRS 175.552.

[3]Both witnesses gave consistent, detailed descriptions matching Browning to the crime. Both witnesses were acutely aware of the man leaving the crime scene; one witness peered out a window for the express purpose of locating

(important factors to be weighed against the corrupting influence of a suggestive identification procedure includes the opportunity a witness has to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time lapse between the crime and the confrontation).

Finally, Browning insists that Josy Elsen's in-court identification of Browning should have been suppressed by the district court because Josy could not make a previous out-of-court identification. Josy's inability to identify Browning during a pre-trial photographic line-up is a factor to be weighed by the trier of fact. Such inability, however, does not render the in-court identification inadmissible. Jones v. State, 95 Nev. 613, 600 P.2d 247 (1979). Thus, the district court properly admitted Josy Elsen's in-court identification testimony.

Having reviewed the record on appeal, and for the reasons set forth above, we conclude that Browning has failed to demonstrate error in this appeal. Accordingly, we affirm the judgment of the district court.

---

the perpetrator; the other witness was forced to move from where he was standing to avoid a collision with the man who was leaving the area. One witness was fairly certain Browning was the man she had seen through a pane of glass; while the other witness positively identified Browning. These identifications were made despite the fact that Browning was not wearing the clothing described by the witnesses. In addition, one witness had been previously shown another suspect prior to viewing Browning, but positively rejected that suspect. Finally, very little time had elapsed between the initial viewing of the suspect and the show-up, further diminishing the risk of memory loss or contamination.