*1306 OPINION
By the Court,
Young, J.:

FACTS

Appellant Deborah Ann Earl (“Deborah”) was convicted for the murder of Bruce Lawson (“Bruce”). At trial, Deborah argued that she killed Bruce in self-defense. Deborah testified that Bruce beat her and raped her in the past. Deborah’s aunt witnessed Bruce hit Deborah on a previous occasion. In fact, Deborah testified that one week before the incident in question, Bruce struck her three times in the head with his fist.
There was also evidence that Bruce had abused other women. For example, police were called to the residence of Bruce’s former girlfriend on four separate occasions because of domestic violence. In addition, Bruce bragged to Deborah that once he choked a woman until she urinated in her pants.
On November 8, 1992, Bruce, Deborah and Deborah’s three children attended a party. While at the party, Bruce hit Deborah, causing her earring to fly off. In addition, she felt dizzy and her face became swollen. Deborah’s eight-year-old son verified that he saw Bruce hit his mother. Later, while under the influence of alcohol and cocaine,[1] Bruce followed Deborah around the house. Deborah apparently became scared and called the police. When the officer arrived, Deborah sent him away and told him that nothing was wrong. Deborah testified that she sent the officer away because some people at the party did not want the police around, and Bruce said he would hit her again if she did not ask the officer to leave.
Deborah testified that after the officer left, Bruce continued to follow her around while aggressively grabbing at her. Deborah further testified that Bruce grabbed her while she was in the *1307 kitchen and pulled her away from the sink. After Bruce grabbed her, Deborah picked up a butcher knife and flashed it at him. She then went into the living room and Bruce continued to follow her. Deborah testified that although there were other people at the party, she became frightened when Bruce “lunged” into her, and she stabbed him.
On January 12, 1993, Deborah was convicted of second degree murder with use of a deadly weapon and sentenced to serve a life sentence for the murder charge and an additional life sentence for use of a deadly weapon. Deborah appeals and argues that there were eight different instances of error. We conclude that the exclusion of jury instructions on Deborah’s theory of the case and damaging remarks made by the district court and the prosecutor justify reversal. Deborah’s remaining arguments are without merit.

DISCUSSION

Jury instructions

Although Deborah alluded to the fact that she may have killed Bruce accidently, the only defense submitted to the jury was self-defense. Accordingly, Deborah argues that she was entitled to an instruction on the “no duty to retreat” rule. A person who reasonably believes that he is about to be killed or seriously injured by his assailant does not have a duty to retreat before using deadly force unless he is the original assailant. State v. Grimmett, 33 Nev. 531, 534, 112 P. 273, 273 (1910).
Deborah offered two instructions on the “no duty to retreat” rule. The language from the first instruction, labeled Instruction “C,” is reproduced below:
[Wjhere a person without voluntarily seeking, provoking, inviting or willingly engaging in a difficulty of his own free will is attacked by assailant and is [sic] necessary for him to take the life of his attacker and to protect his own, then he need not flee for safety but has a right to stand his grounds and slay his adversary.
This instruction is from Grimmett, the leading Nevada case on the “no duty to retreat” rule.
This court has interpreted the “no duty to retreat” rule to mean that the person must reasonably believe he is about to be attacked with deadly force.[2] See Culverson v. State, 106 Nev. 484, 489, *1308 797 P.2d 238, 242 (1990). Deborah’s other instruction on the “no duty to retreat” rule, labeled Defendant’s “E,” incorporated this reasonable belief interpretation. The language from Defendant’s “E” is reproduced below:
[A] person who is not the original aggressor has no duty to retreat before using deadly force if a reasonable person in the position of the non-aggressor [sic] would believe that the assailant is about to kill or I guess seize or cause — I think it’s meant to say serious bodily harm — to the nonaggressor or any person in the presence or company of the nonaggressor.
The district court rejected both Deborah’s proffered instructions. The district court rejected Instruction “C” “because of the complexity and because of the fact that the sum and substance has already been given.” Where the district court refuses a jury instruction on defendant’s theory of the case that is substantially covered by other instructions, it does not commit reversible error. Shannon v. State, 105 Nev. 782, 787, 783 P.2d 942, 945 (1989); Bean v. State, 81 Nev. 25, 34, 398 P.2d 251, 256 (1965), cert. denied, 384 U.S. 1012 (1966).
We conclude that the “no duty to retreat” rule was not substantially covered by other instructions in the case at bar. The only instruction submitted to the jury that addressed the “no duty to retreat” rule was a portion of instruction number 18. This instruction, as read by the district court, stated, “A person is not bound to retreat from his home even though a retreat might be safely made aware, fear of any of the offenses mentioned above to prevent which the homicide shall not be sufficient to justify the killing.” We conclude that this instruction is more confiising than those proposed by Deborah and actually limits the “no duty to retreat” rule because Deborah was not in her own home when the stabbing occurred.
Although the instructions on self-defense that were submitted to the jury are extensive, whether Deborah should have retreated was also an issue in this case. Therefore, Deborah deserved to have a “no duty to retreat” instruction submitted to the jury. “[T]he defense has the right to have the jury instructed on its theory of the case as disclosed by the evidence, no matter how weak or incredible that evidence may be.” Margetts v. State, 107 Nev. 616, 619, 818 P.2d 392, 394 (1991) (citation omitted) (emphasis added).
Where a district court refuses to give an instruction for a specific reason and the problem can be corrected in a substitute *1309 instruction, a substitute instruction should be requested. See Ford v. State, 99 Nev. 209, 212, 660 P.2d 992, 994 (1983). In this case, however, Deborah’s attorney was not incorrect in failing to request a more precise “no duty to retreat” instruction. One of Deborah’s proffered instructions was denied because the district court felt the sum and substance had already been given. Therefore, offering another instruction would have been in vain.
Although Bruce’s mother testified that her son thought Deborah was “crazy,” this should not preclude Deborah from fully instructing the jury on her theory of the case. Arguing that Deborah may have been the abusive partner, and therefore not defending herself on the night of the incident, is unsupportable by the facts of the case at bar.
The record reveals that Deborah feared Bruce on the night of the stabbing, and not vice versa. There was evidence that (1) Bruce beat and raped Deborah in the past — one incident where Bruce hit Deborah was confirmed by a witness; (2) one week before the homicide, Bruce hit Deborah three times in the head with his fist; (3) Deborah was aware that on four separate occasions, the police were called to the home of Bruce’s former girlfriend because of domestic violence by Bruce; (4) Bruce bragged to Deborah that he once choked a woman until she urinated in her pants; (5) on the night of the homicide, Bruce ingested enough cocaine and consumed enough alcohol to cause “bizarre” behavior; and (6) also on the night of the homicide, Deborah’s eight-year-old son witnessed Bruce hitting Deborah, causing her to become dizzy and her face to become swollen.
Although we recognize that there are occasions when women abuse men, those situations are irrelevant to the case at bar. The record definitely indicates that the abusive party in this domestic relationship was Bruce, and not Deborah.
As this court’s precedents mandate, we conclude that Deborah was entitled to have the jury properly instructed on her theory of the case no matter how weak or incredible the evidence is that supports her theory. See Margetts, 107 Nev. at 619, 818 P.2d at 394; Barger v. State, 81 Nev. 548, 552, 407 P.2d 584, 586 (1965).
In light of the foregoing, we conclude that the district court erred in excluding Deborah’s “no duty to retreat” instructions.

Judicial bias and prosecutorial misconduct

After a careful review of the record on appeal, we conclude that the district court and the prosecutor made several comments which were in error. Because the district court excluded the jury instructions, as discussed above, all errors need not be addressed to reach our disposition of this case. However, for clarity, we *1310 discuss several examples below. These errors individually may not have been prejudicial; however, together they reflect the cumulative nature of error that occurred during this trial.
The following are examples of the district court’s actions:

Number One

[Deborah’s attorney]: Was there, was he acting in the same way or was he acting differently than the other times he abused you?
The Court: If you object I will sustain.
[The State]: I object.
The Court: Sustained. The question will be stricken. And you are directed again to do it correctly or I will confine you too [sic] a new subject matter entirely. Do you understand me?
[Deborah’s attorney]: Yes Your Honor.
After several more questions where Deborah’s attorney led his own witness, the district court judge remarked, in front of the jury, “You know, I am going to take a five minute recess and I am going to tell you how to practice law.” The district court then excused the jury, held Deborah’s attorney in contempt, fined him $250.00, and threatened to put him in jail — all for leading his witness on a few questions.

Number Two

During the closing argument of Deborah’s attorney, the district court judge asked Deborah’s attorney to repeat one of the instructions that he had quoted incorrectly. Deborah’s attorney then began to repeat the instruction to which the district court judge replied, “If you don’t know it, I am saddened for you.”

Number Three

Again during the closing argument of Deborah’s attorney, he characterized Bruce as “grabbing, pulling and tearing . . . .” The prosecutor objected because there was no evidence of tearing. The district court judge then remarked, again in front of the jury, “There was no testimony from any source about any tearing. Your characterizations are too bizarre now. Maybe you better watch what you have been drinking.” (Emphasis added.)
Contrary to the dissent, which mischaracterizes the district *1311 court’s comments as “not so prejudicial,” we believe that the district court’s implications that Deborah’s attorney was incompetent and intoxicated at the time of trial were clearly in error.

Number Four

During the prosecutor’s closing argument, Deborah’s attorney objected to the characterization of Deborah’s testimony as “malarkey” to which the district court judge replied, “It is a good expression, amongst we Irish at least.” The prosecutor then replied, “You stole my line.”
The comment made by the prosecutor may have been harmless had the objection to it simply been sustained or overruled by the district court without further comment. However, the district court’s response to the objection, stating that “malarkey” was a “good expression,” could have readily led the jury to believe that the district court agreed with the prosecutor’s characterization of Deborah’s testimony.

Number Five

There was also at least one instance where the prosecutor may have acted inappropriately. As stated above, during the prosecutor’s closing argument, he characterized Deborah’s testimony as “malarkey.” Specifically, the prosecutor stated, “And the stuff about, oh, I was so afraid he was going to do all the damage to me. You can tell from her own testimony, it was malarkey.” This remark by the prosecutor violated his duty not to inject his personal beliefs into argument and, more appropriately, not to ridicule or belittle the defendant or the case. See Barron v. State, 105 Nev. 767, 780, 783 P.2d 444, 452 (1989) (citing McGuire v. State, 100 Nev. 153, 677 P.2d 1060 (1984)); see also, Ross v. State, 106 Nev. 924, 927, 803 P.2d 1104, 1106 (1990) (although demonstrating bias on the part of the witness is permissible, stating that the witness is lying is not); Witherow v. State, 104 Nev. 721, 765 P.2d 1153, 1155 (1988) (an opinion as to the veracity of a witness in circumstances where veracity might well have determined the ultimate issue of guilt or innocence is improper).
Although these references alone may not have amounted to prejudicial error, considering the cumulative effect of these errors and the fact that the evidence against Deborah was not overwhelming on the question of whether she had the required intent to commit second degree murder, Deborah’s case was prejudiced *1312 in respect to a substantial right. See Sipsas v. State, 102 Nev. 119, 125, 716 P.2d 231, 235 (1986); Polito v. State, 71 Nev. 135, 140, 282 P.2d 801, 803 (1955).
We are not condoning Deborah’s actions or proclaiming her innocence of any wrongdoing, nor are we freeing a murderer or liberating Deborah from the responsibility she must face during her new trial for the events which led to Bruce’s death. Instead, we are acknowledging that Deborah was not afforded the opportunity to instruct the jury on the “no duty to retreat” rule. Also, we recognize that the district court and prosecutor made several comments which were in error.
Accordingly, we reverse Deborah’s conviction and remand this case to the district court for a new trial.
Shearing and Rose, JJ., concur.

 An expert testified that Bruce had enough alcohol and cocaine in his blood to cause “bizarre behavior.”

 Deadly force is defined as “force likely or intended to cause death or great bodily harm.” Black’s Law Dictionary 398 (6th ed. 1990) (emphasis added).